IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

**ENTERED**
**07/22/2009**

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| JAMES C. ROLLINGS, | ) | CASE NO. 04-31511-H3-7 |
| | ) | |
| Debtor, | ) | |
| | ) | |
| W. STEVE SMITH, TRUSTEE and | ) | |
| JAMES C. ROLLINGS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | ADV. NO. 08-3216 |
| | ) | |
| RAMDE INTERNATIONAL, INC., | ) | |
| PETROSANTANDER | ) | |
| MANAGEMENT, INC., and | ) | |
| PETROSANTANDER (COLOMBIA), | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM OPINION

The court has held a trial in the above captioned adversary proceeding.  The following are the Findings of Fact and Conclusions of Law of the court.  A separate conforming Judgment will be entered.  To the extent any of the Findings of Fact are considered Conclusions of Law, they are adopted as such.  To the extent any of the Conclusions of Law are considered Findings of Fact, they are adopted as such.

Findings of Fact

James C. Rollings ("Debtor") filed a voluntary petition under Chapter 13 of the Bankruptcy Code on January 31, 2004.  The

case was converted to a case under Chapter 7 of the Bankruptcy Code by order entered June 14, 2004.  W. Steve Smith ("Trustee") is the Chapter 7 Trustee.

In the complaint in the instant adversary proceeding, the Chapter 7 Trustee, in his capacity as trustee and as successor to J-Tech International, LLC ("J-Tech"), a liquidated limited liability company, and Debtor, to the extent there may be a surplus of funds in the estate to pay all claims of creditors, seek a recovery on breach of contract and quantum meruit grounds with respect to work performed by J-Tech on oilfield equipment owned by Petrosantander.[1]  As set forth below, the court finds that there were two oral contracts, one of which resulted in a written memorial.

In early October, 2004, Petrosantander purchased from Texas International Oil Tools, Ltd. ("TIOT") a 1976 Cabot 750 horsepower mobile drilling rig.  Troy Finney, Petrosantander's operations manager for Latin American production and operations, testified that Petrosantander acquired the rig in order to ship it to Colombia to complete Petrosantander's oil drilling obligations in Colombia.  He testified that, at the time

---

[1]During the trial of the instant adversary proceeding, the name "Petrosantander" was used generally for the two defendant entities in the instant adversary proceeding.  The parties have stipulated that, at all times, defendant Ramde International, Inc. was the agent of Petrosantander.  Accordingly, the court identifies the defendants in the instant adversary proceeding as "Petrosantander."

Petrosantander acquired the rig for $450,000, drilling equipment could not be located in Colombia for the depths to which Petrosantander sought to drill.

The 1976 Cabot drilling rig is built on a substructure with telescoping metal legs which can adjust the height of the rig from the ground.  The rig has a metal floor atop the substructure.  Above the metal floor, there is a mast, which is a derrick structure that can be raised and lowered with hydraulic cylinders.  In between the mast and the metal floor sits the drawworks.  The drawworks is a drum, connected to an engine by a shaft, on which cable is installed.  The cable allows the operator to raise and lower a traveling block, from which the drilling bit and pipe are suspended.  The block is not a solid piece of metal.  It has shivs connected to the cable.  There is a rotary table, on the metal floor.  The rotary table turns the bit and the drill pipe.  The rotary table is connected to an engine by a chain.  There is a swivel, which permits the pumping of drilling mud into the drill pipe.  The rig has a brake which governs the speed of the drawworks.  The entirety of the rig is mounted on a six-axle chassis, allowing the rig to be moved.

Finney testified that the rig was not ready for drilling operations when Petrosantander acquired it.  He testified that Petrosantander was under time constraints, and needed to get drilling underway in Colombia.  He testified that

the rig was old, and needed to be repaired.  He testified that
Petrosantander could have transported the rig to Colombia for
repair, but chose to have the rig repaired in the United States
because parts were available.

Finney testified that he met with Richard Hellinger (a
representative of TIOT), Danny Thompson (Petrosantander's
drilling and workover supervisor), Amando Ramirez (a contractor
who handled logistics and purchasing in the United States for
Petrosantander), and Debtor.[2]  He testified that Hellinger
recommended J-Tech (then operated by Debtor) to do repairs to the
rig.

<u>Services Covered By The Initial Agreement</u>

The initial discussions between Debtor and
representatives of Petrosantander are the subject of disagreement
among the witnesses as to the scope of the work J-Tech was
ultimately engaged to perform on behalf of Petrosantander.

Finney testified that J-Tech agreed to inspect and
repair the hydraulic system, the rotary table, the gear drive,
the chain box, and the hydromatic brake.  He testified that

---

[2]At that time, Debtor represented J-Tech.  Debtor was the
owner of J-Tech prepetition.  The court notes that Debtor's
bankruptcy case had been converted to Chapter 7 by the time J-
Tech transacted business with Petrosantander.  However, any
disputes between Debtor and Trustee with respect to J-Tech are
not before the court in the instant adversary proceeding.  For
the purposes of the instant adversary proceeding only, the court
presumes that Debtor continued as an agent to operate J-Tech for
the Trustee.

Petrosantander was to purchase directly all of the spare parts and equipment to do that work.  He testified that J-Tech agreed to open, inspect, and repair the block and the swivel.  He testified that, initially, Debtor estimated a price of $40,000 for labor to complete the work.  He testified that he and Debtor agreed on a price of approximately $32,000 to do the work on a turnkey basis.

Ramirez testified that he was present when Finney and Debtor were discussing the scope of the work.  Ramirez testified that he gave an estimate only of his own fee, and did not participate in the negotiation between Finney and Debtor. Ramirez testified that J-Tech agreed to inspect and repair the hydromatic brake, swivel, block hook, rotary table, and rotary chain case for $32,000.

Debtor testified that J-Tech agreed to repair the block, the swivel, the rotary table, and the rotary chain, install the hydromatic brake, and replace hydraulic hoses, for $32,200.

During December, 2004, Debtor approached Ramirez, seeking a down payment so that he could pay his workers.  Ramirez testified that Petrosantander had requested an invoice, in order to provide funds to J-Tech.  Ramirez testified that Debtor told him that Debtor was unable to prepare an invoice.  Ramirez offered to prepare an invoice.

The invoice prepared by Ramirez lists amounts of $4,500 for the block repair, $5,000 for the swivel repair, $4,500 for rotary table repair, $3,200 for rotary chain repair, $12,000 for hydraulic hose replacement, and $3,000 for the hydraulic brake, for a total of $32,200.  (Defendants' Exhibit 10).

After Ramirez prepared the invoice, Petrosantander paid $16,000 to J-Tech.

Debtor testified that he agreed to the inclusion of the numbers Ramirez placed on the invoice Ramirez created.  However, he testified that his understanding was that the numbers represented a cost to "tear down" and inspect each of the items, and did not represent a complete agreement for the cost of repair.  He testified that it was impossible to come to a final price for repair until each of the pieces was inspected.

Debtor testified that J-Tech did work on the rotary table, the chain case, the hydromatic brake, and the block hook. He testified that J-Tech did additional work on the rig itself, for which J-Tech is requesting $76,500 in payment.[3]  He testified that J-Tech replaced air lines and hydraulic hoses, removed an engine to have it rebuilt,[4] replaced valves and brake relays,

---

[3]Plaintiffs' pretrial statement (Docket No. 13) lists as an exhibit an invoice, dated October 11, 2004, in the amount of $76,500.  The invoice is not in evidence.  Debtor testified that an invoice was prepared in 2007, after Trustee examined Debtor's records.

[4]The rebuilding of the engine was completed by a separate contractor.

6

rerouted the air hoses, welded hydraulic jacks into the rig.  He testified that all the work was done at Ramirez' direction. Debtor testified that $76,500 is a reasonable value for the work performed.

The court finds that the scope of the work covered by the contract formed at the first meeting between Finney, Ramirez, Thompson, and Debtor included inspection and repair of the rotary table, the rotary chain case, the hydromatic brake, and the swivel, and replacement of the hydraulic hoses, for an estimated price of $32,200.

As to the components of the $32,200, the following is a summary of the testimony:

With respect to the inspection and repair of the rotary table, Debtor testified that a reasonable range for inspection and repair costs was $6,500 to $14,000.  Ramirez testified that he acquired a used rotary table for $5,000.  Debtor testified that the value of a remanufactured rotary table is $50,000 to $58,000.  Debtor testified that J-Tech's charge for work on the rotary table is $9,850.  The court finds the amount of $9,850 to be reasonable for J-Tech's work on the rotary table.

With respect to the inspection and repair of the chain case, Debtor testified that a reasonable range for inspection and repair costs was $8,500 to $14,000.  He testified that the market value of a new chain case is $14,000 to $18,500.  He testified

7

that J-Tech's charge for work on the chain case is $9,250.  The court finds the amount of $9,250 to be reasonable for J-Tech's work on the chain case.

With respect to inspection and repair of the hydromatic brake, Debtor testified that a reasonable price was $6,850.  He testified that the retail value of a refurbished hydromatic brake is $16,000.  He testified that J-Tech's charge for work on the hydromatic brake is $4,250.  The court finds the amount of $4,250 to be reasonable for J-Tech's work on the chain case.

With respect to the swivel, Debtor testified J-Tech is not seeking payment.

With respect to the replacement of hydraulic hoses, there is no specific testimony as to the reasonable value of the services rendered.  Debtor testified that he spent approximately $8,000 for the purchase of air hoses, hydraulic hoses, and connectors.  Debtor's testimony is internally contradictory. Debtor testified that the replacement of hydraulic hoses was covered under the initial estimate, but Debtor also testified the replacement and rerouting of hydraulic hoses and air hoses is a substantial part of the $76,500 for which J-Tech is seeking payment.  The court finds that the $8,000 parts cost of the hoses is reasonable.  The court finds that a total cost of $12,000 for the hoses, including labor (representing the amount Debtor identified for Ramirez to prepare the invoice) is reasonable.

8

The court finds that the installation of the hoses was covered by the initial agreement.  The court finds that $32,200 is a reasonable price for the services agreed in the initial agreement, and that J-Tech's performance of the services under the initial agreement is sufficient for the allowance of the $32,200.

<u>Services Not Covered By The Initial Agreement</u>

The parties have stipulated that the work on the block hook, for which J-Tech has requested $8,990, was done, and was not covered by the initial agreement between the parties.

There were additional services not covered by the initial agreement.  Debtor testified that J-Tech removed one engine and reinstalled the new engine, replaced valves, and installed hydraulic jacks.  Ramirez testified that J-Tech installed two leveling jacks, removed a hydraulic cylinder attached to the mast, and welded a portion of the substructure with additional support.

With respect to the removal and reinstallation of the engine, Ramirez testified that the outside contractor that rebuilt the engine, rather than J-Tech, removed the engine and reinstalled it.  The court finds Debtor's testimony on this question to be more credible, in light of his hands-on, day to day work on the rig.  Debtor testified that his hourly rate was $50 in 2004.  The court finds this testimony to be credible.  The

court finds that a reasonable cost for the removal and reinstallation of the engine is $400.[5]

With respect to replacement of valves, Ramirez testified that Debtor performed this service personally. Ramirez testified that Debtor spent approximately four hours. The court finds that a reasonable cost for replacement of the valves is $200.

With respect to the installation of jacks, Thompson testified that this work was related to the welding repair of the substructure. Thompson testified that the work required three to five days, with two welders, each at $30 per hour. The court finds that a reasonable cost for the welding of the substructure is $2,400.

With respect to the hydraulic cylinder attached to the mast, Thompson testified that Debtor spent one hour removing the old cylinder and attaching the new cylinder. The court finds that a reasonable value for this work is $50. The court finds that a reasonable value for the work not addressed in the initial agreement is $3,050.[6]

---

[5]The court notes that no witness testified as to the number of hours worked by Debtor in removing and replacing the engine. The court finds eight hours to be a reasonable time, for the reason that more than eight hours likely would have been noticed by the witnesses.

[6]This amount does include the amounts for removal and reinstallation of the engine, replacement of valves, installation of jacks, and replacement of the hydraulic cylinder. The amount does not include the separate work on the block hook to which the

Conclusions of Law

State law provides the rules governing the process of interpreting contracts. River Prod. Co. v. Webb (In re Topco, Inc.), 894 F.2d 727 (5th Cir. 1990).

Under Texas law, whether a contract is ambiguous is a question of law for the court to decide.  If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. Friendswood Dev. Co. v. McDade + Co., 926 S.W.2d 280 (Tex. 1996).

The determination is made by looking at the contract as a whole in light of the circumstances present at the time the contract was executed.  The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. National Union Fire Ins. Co. v. CBI Indus., 907 S.W.2d, at 520.

The elements of written and oral contracts are the same and must be present for a contract to be binding. Bank of El Paso v. T.O. Stanley Boot Co., 809 S.W.2d 279 (Tex. App.-El Paso 1991), aff'd in part, rev'd in part on other grounds, 847 S.W.2d (Tex. 1992).  A binding contract requires: (1) an offer, (2) acceptance (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. See Labor Ready Cent.

───────────────

parties have stipulated.

11

III, L.P. v. Gonzalez, 64 S.W.3d 519 (Tex.App.-Corpus Christi 2001, no pet.); Komet v. Graves, 40 S.W.3d 596 (Tex.App.-San Antonio 2001, no pet.).

In the instant case, there were two oral contracts. There was a first oral contract for performance of the services described in the initial meeting.  The first contract resulted in a written memorial which is unambiguous.  J-Tech agreed to perform these services for $32,200, and did so.  J-Tech is entitled to $32,200 for the services under the initial contract, of which $16,000 has been paid.

There was a second oral contract for J-Tech to perform additional work.  There is no written memorial of the second contract.  The court concludes that a reasonable amount should be allowed.  J-Tech is entitled to recover for its work on the block hook, in the amount of $8,990, and for its other work on the rig, in the amount of $3,050.

Based on the foregoing, a separate conforming Judgment will be entered.

Signed at Houston, Texas on July 22, 2009.


LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE